EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Margarita Sánchez, et al<br><br>    Demandantes-Apelantes<br><br>          v.<br><br>Secretario de Justicia, et al.<br><br>    Demandados-Apelados | Certiorari<br><br>2002 TSPR 98<br><br>157 DPR ＿＿＿ |

Número del Caso: AC-2000-63

Fecha: 28/junio/2002

Tribunal de Circuito de Apelaciones:
                    Circuito Regional I

Juez Ponente:
                    Hon. Héctor Urgell Cuebas

Abogados de la Parte Apelante:
                    Lcda. Nora Vargas Acosta
                    Lcda. Sheila I. Vélez Martínez
                    Lcdo. Charles Hey Maestre

Oficina del Procurador General:
                    Lcdo. Roberto J. Sánchez Ramos
                    Procurador General

                    Lcda. Vannessa Ramírez
                    Procuradora General Auxiliar

Materia: Sentencia Declaratoria, Injunction Permanente, etc.

    Este documento constituye un documento oficial del Tribunal Supremo
    que está sujeto a los cambios y correcciones del proceso de
    compilación y publicación oficial de las decisiones del Tribunal.
    Su distribución electrónica se hace como un servicio público a la
    comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Margarita Sánchez, et al

    Demandantes-Apelantes

       vs.                          AC-2000-63          Certiorari

Secretario de Justicia, et al

    Demandados-Apelados


PER CURIAM


San Juan, Puerto Rico, a 28 de junio de 2002

A través de este recurso debemos determinar si los demandantes-peticionarios –Margarita Sánchez de León, Fulana de Tal, José Joaquín Mulinelli Rodríguez, Sutano Más Cual, Edgard Danielsen Morales, William Morán Berberena y la American Civil Liberties Union (A.C.L.U.)– ostentan legitimación activa para solicitar que un tribunal se exprese en cuanto a la constitucionalidad del Art. 103 del Código Penal de Puerto Rico. Por los fundamentos vertidos en esta opinión, entendemos que los peticionarios carecen de ella.

I

Este recurso se originó en una demanda presentada el 23 de junio de 1998 ante el Tribunal

de Primera Instancia, Sala Superior de San Juan. En ésta, los peticionarios solicitaron que a tenor con la Regla 59 de Procedimiento Civil, 32 L.P.R.A. Ap. III R. 59, se declarase inconstitucional el Art. 103 del Código Penal, respecto a la modalidad de sostener relaciones sexuales con personas del mismo sexo y el crimen contra natura; o se prohibiese su aplicación contra ellos. Alegaron que el referido artículo criminaliza ciertos actos íntimos, consensuales y no comerciales entre adultos, lo cual acarrea una violación al derecho de intimidad y a la igual protección de las leyes. Además, afirmaron que la modalidad "crimen contra natura" es constitucionalmente vaga.

El 25 de agosto de 1998, el Estado Libre Asociado de Puerto Rico, solicitó la desestimación de la demanda, bajo la premisa de que no existía una controversia justiciable entre las partes, pues los demandantes no habían sido procesados bajo el estatuto en cuestión, ni estaban en peligro de serlo. Adujo que los demandantes carecían de legitimación activa para entablar la demanda, y que pretendían que el tribunal emitiese una opinión consultiva.

Los peticionarios se opusieron a la moción de desestimación. Alegaron que sí existía una controversia real entre las partes, ya que el referido artículo les había causado daños. En síntesis, aseveraron que la peticionaria, Margarita Sánchez, de orientación sexual lesbiana, intentó testificar sobre una ley que estaba siendo estudiada ante una comisión de la Cámara de Representantes, pero que se vio cohibida de hacerlo, cuando un legislador le preguntó si ella practicaba actos de lesbianismo o participa en relaciones íntimas del tipo prohibido por el Art. 103, y le advirtió de la posibilidad de que podía ser procesada penalmente por dichos actos.

Los peticionarios citaron, además, declaraciones hechas por el Subsecretario de Justicia, Lcdo. Ángel Rotger Sabat, ante la Asamblea

Legislativa, en donde éste expresaba que el Departamento de Justicia tenía la intención de hacer cumplir el Art. 103 del Código Penal y procesar sus violaciones.

Por otra parte, los peticionarios reconocen que han incurrido en conducta que podría resultar violatoria de dicho estatuto, al haber compartido intimidad sexual con sus parejas permanentes, y que tienen la intención de continuar con esa conducta en el futuro. La peticionaria A.C.L.U. admitió que algunos de sus miembros han incurrido en conducta que podría resultar violatoria del Art. 103, y que continuarán incurriendo en tal conducta. También sostuvieron que la mera existencia del estatuto cuestionado, les causaba daños, porque temen ser arrestados y procesados penalmente.

El E.L.A., en su réplica a la oposición de desestimación, reiteró su argumento de que no existe una controversia real o genuina, ya que los demandantes no han sufrido ningún daño atribuible a la existencia del Art. 103. Además, mencionó el caso <u>Bowers v. Hardwick</u>, 478 U.S. 186 (1986), en el cual el Tribunal Supremo Federal sostuvo la constitucionalidad de un estatuto del Estado de Georgia, similar al Art. 103, bajo el fundamento de que no existe un derecho fundamental a tener relaciones sexuales sodómicas en la privacidad del hogar.

El 26 de febrero de 1999, el Tribunal de Primera Instancia declaró sin lugar la moción de desestimación presentada por el E.L.A.; determinó que los peticionarios tenían legitimación activa en virtud de <u>Babbitt v. United Farm Workers Nat. Union</u>, 442 U.S. 289 (1979), y <u>Steffel v. Thompson</u>, 415 U.S. 452 (1974), y que existía una controversia real entre las partes.

De dicha resolución, el E.L.A. recurrió al Tribunal de Circuito de Apelaciones. Ese foro resolvió, el 28 de abril de 2000, que los

peticionarios carecían de legitimación en causa para incoar la demanda de autos.

Inconformes con tal determinación, los peticionarios acuden ante nos señalando, en síntesis, que erró el tribunal apelativo al resolver que ellos no tienen legitimación activa para cuestionar la constitucionalidad del Art. 103 del Código Penal, ya que Bowers v. Hardwick, impide su reclamo, y porque no han sido arrestados por violar esa disposición penal. También, indican que incidió dicho foro al ignorar sus reclamos al amparo de sus derechos a la igual protección de las leyes.

El 19 de enero de 2001, acogimos el recurso en reconsideración.

El 8 de junio de 2001, el Procurador General de Puerto Rico compareció ante nos reconociéndole legitimación activa a los peticionarios.

II

El delito de sodomía, se insertó en Puerto Rico a través del Código Penal de 1902, procede del Código de California[1], y en su original redacción, decía como sigue:

> Toda persona culpable del infame crimen contra natura, cometido con un ser humano ó con alguna bestia, incurrirá en pena de reclusión en presidio por un término mínimo de cinco años. *Estatutos Revisados y Códigos de Puerto Rico, 1902.*

De la misma manera se mantuvo en el Código de 1937, hasta la redacción del Código Penal de 1974, Ley 115 de 22 de Julio de 1974[2], que pasó a conceptualizarse de la siguiente manera:

---

[1] García- Gregory, J. y Souss-Villalobos, J., *Infame Crimen Contra Natura: Aberración Constitucional*, 40 Rev. Jur. U.P.R. 399, 404 (1971).

[2] En 1967, el Profesor Francisco Pagán Rodríguez sometió a la Legislatura un proyecto para no tipificar la conducta sexual entre adultos del mismo sexo, el cual por enmiendas en la cámara baja no llego a materializarse. Dora Nevares Muñiz, Análisis Crítico del Código Penal de Puerto Rico, 24 Rev. Jur. U.I.P.R. 10 (1989).

    Art. 103: Toda persona que sostuviere relaciones sexuales con
    una persona de su mismo sexo o cometiere el crimen contra natura
    con un ser humano será sancionada con pena de reclusión por un
    término mínimo de un (1) año y máximo de diez (10) años. Ley Núm.
    115 de 22 de julio de 1974.[3]

Este artículo ha sido objeto de tres enmiendas, la primera de las cuales insertó las modalidades del delito; y las otras dos se produjeron como consecuencia de cambios generales dentro del articulado del Código Penal, por lo cual no pretendían agravar específicamente la situación de quienes cometen el delito en su modalidad consensual entre adultos y en la intimidad de su hogar. Así, la Ley Núm. 55 de 30 de mayo de 1979, dispuso una pena más severa cuando la víctima es menor de catorce años (inciso (a) del Art. 103), o cuando no hay voluntariedad entre las personas que cometen el delito, ya sea por razón de que la víctima padece de algún impedimento físico o psíquico, o por haber mediado el uso de fuerza, violencia o intimidación por parte del autor del delito (inciso (b) y (c) del Art. 103). La Ley Núm. 101 de 4 de junio de 1980, enmendó casi completamente el Código Penal a los fines de establecer un sistema de sentencias determinadas en todos los delitos, a raíz de la cual se impuso un término fijo de reclusión por seis (6) años. Por último, la Ley Núm. 57 de 3 de junio de 1983, aumentó las penas a ciertos delitos graves comúnmente cometidos; aparentemente de forma

---

[3] "El término relación sexual no es definido en el Código Penal. Los comentarios del Secretario de Justicia a la edición de 1975 (p.185, ed. 1986) y el desarrollo que siguió el delito en los Estados Unidos, nos permiten concluir que se incluye bajo el término relación sexual no solo las relaciones de coito anal sino también las relaciones de estímulo oral entre personas del mismo sexo. MIRO CARDONA, 497, indica sobre la expresión equivalente en el Proyecto de Pagán que en el concepto de relación homosexual entre hombres y mujeres hasta llegar al coito anal." Dora Nevares-Muñiz, *Código Penal de Puerto Rico*, Ed. 2000, pág. 202.

inadvertida, aumentó también la pena del delito de sodomía a pena fija de diez (10) años.[4]

Es importante destacar que en un siglo de existencia de esta disposición penal en nuestra jurisdicción, no existe documentación alguna que evidencie que haya sido arrestada, procesada o acusada persona alguna por dicho delito cuando la conducta penada cuenta con el consentimiento de las personas que lo practican, se realiza entre adultos y en privado. Véase: José Dávila-Caballero*, Entre el Silencio y lo Criminal: la Orientación Sexual, el Clóset y el Derecho Puertorriqueño*, 68 Rev. Jur. UPR página 665, 669; Chris Hawley, Justice Oficial: *Sodomy Law Will be Enforced*, The San Juan Star (Puerto Rico), 5 de diciembre de 1997, página 10.

III

---

[4] "El establecimiento de penas más severas en proporción al delito para los delitos graves que más afectan a nuestra población es una medida efectiva. Hemos encontrado que en un sin número de ocasiones las penas para ciertos delitos no guardan proporción con el delito y con el daño infringido a la víctima y a la sociedad." Exposición de Motivos de la Ley Núm. 57 de 3 de junio 1983, *Leyes de Puerto Rico*, pág. 128.

"De acuerdo a varios informes de la Superintendencia de la Policía de 1982 los delitos más comúnmente cometidos en Puerto Rico, son los delitos de asesinato, homicidio voluntario, violación, robos, agresiones agravadas, delitos contra la propiedad, escalamientos, y apropiación ilegal. Esta ley tienen como propósito ampliar las penas de algunos de estos delitos para atemperarlos a la realidad puertorriqueña y combatir la incidencia criminal." *Id.*, pág. 129.

Como podemos ver, en la narración que antecede no se incluye el delito de sodomía, por lo cual colegimos que no existía una intención específica de agravar la situación de los homosexuales o heterosexuales que practican la conducta prohibida en la intimidad del hogar, entre personas adultas y entre las cuales medió el consentimiento; debido a ello estamos convencidos de que la enmienda lo abarcó inadvertidamente, máxime cuando no se puede hablar de este delito como parte de una alta tasa de criminalidad ya que nadie fue siquiera en la historia del estatuto alguna vez arrestado. De allí que puede inferirse que el legislador tuvo en mente sólo sus modalidades, pues no somos ajenos al aumento alarmante en los delitos sexuales contra menores de edad. Véase: Mabel M. Figueroa, *Dramático el abuso sexual*, Primera Hora, jueves 7 de marzo de 2002, Pág. 26; Marga Páres Arroyo, *Reforzarán los servicios a las mujeres violadas*, El Nuevo Dia, jueves 7 de marzo de 2002, pág. 22.

Reiteradamente hemos resuelto que los tribunales debemos ser celosos guardianes de nuestra jurisdicción[5], estando obligados, incluso, a considerar dicho asunto *motu proprio*. Padró v. Epifanio Vidal, S.E., res. el 14 de febrero de 2001, 2001 TSPR 15; Vázquez v. A.R.P.E., 128 D.P.R. 153 (1991); Martínez v. Junta de Planificación, 109 D.P.R. 839 (1980); Sociedad de Gananciales v. A.F.F., 108 D.P.R. 644 (1979).

La jurisdicción, fuente principal de la autoridad de los tribunales para interpretar y hacer cumplir las leyes en nuestro sistema de gobierno, se halla gobernada por la aplicación de las diversas doctrinas que dan vida al principio de justiciabilidad: legitimación activa, academicidad y cuestión política. P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995).

Debido a ello, previo a entrar en los méritos de un caso, debemos determinar si la controversia es justiciable. Nuestra autoridad para analizar aspectos relacionados con la justiciabilidad de los pleitos, si ficticios, académicos o colusorios, deriva "del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen un interés real de obtener un remedio que haya de afectar sus relaciones jurídicas." E.L.A. v. Aguayo, 80 D.P.R. 552, 559 (1958). Véase: Hernández Torres v. Gobernador, 129 D.P.R. 824 (1992).

Esta limitación al Poder Judicial, que emerge de la Constitución y/o de la jurisprudencia[6], nace de una doble realidad: el que los

---

[5] La jurisdicción "es el poder o autoridad de un tribunal para considerar y decidir casos o controversias". Gearheart v. Haskell, 87 D.P.R. 57, 61; Brunet Justiniano v. Gobernador, 130 D.P.R. 248, 255 (1992).

[6] A través de E.L.A. v. Aguayo, *supra*, se insertó en nuestra jurisdicción el requisito de caso o controversia explícitamente contenido en la Constitución Federal.

tribunales sólo pueden decidir controversias dentro de un contexto adversativo, capaz de resolverse por medio de un proceso judicial; y de la división tripartita de Gobierno republicano, que asegura que la Rama Judicial no intervendrá en áreas sometidas al criterio de otros poderes de gobierno. Noriega v. Hernández Colón, 135 D.P.R. 406 (1995); Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715 (1980).

> La jurisprudencia nos señala que un asunto no es justiciable, cuando: se trata de resolver una cuestión política; cuando una de las partes no tiene capacidad jurídica para promover el pleito; cuando después de comenzado el pleito, hechos posteriores lo convierten en académico; cuando las partes buscan obtener una "opinión consultiva", cuando se promueve un pleito que no está maduro. Noriega v. Hernández Colón, 135 D.P.R. 406, 422-21 (1994).

Apartarnos de esta norma, firmemente desarrollada y férreamente arraigada en nuestra jurisprudencia, es caer irremediablemente en pronunciamientos abstractos, especulativos, y consultivos.

IV

Por medio de la doctrina la legitimación activa se persigue demostrarle al tribunal que la parte demandante tiene un interés en el pleito "de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia". Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 413 (1982).

En numerosos pronunciamientos hemos establecido que esta doctrina le exige al promovente de la acción demostrar: 1) que ha sufrido un daño claro y palpable; 2) que el referido daño es real, inmediato y preciso, no abstracto o hipotético; 3) que existe una conexión entre el daño sufrido y la causa de acción ejercitada; 4) y que la causa de acción surge al palio de la Constitución o de una ley. Colegio de Peritos Electricistas de P.R. v. A.E.E., res. el 22 de

febrero de 2000, 2000 TSPR 28; García Oyola v. J.C.A., 142 D.P.R. 532 (1997); P.P.D. v. Gobernador, 139 D.P.R. 643 (1995); Asociación de Maestros v. Torres, 136 D.P.R. 742 (1994); Noriega v. Hernández Colón, supra; Hernández Torres v. Hernández Colón, 129 D.P.R. 824 (1992).[7]

Por otra parte, cuando quién pretende demandar a nombre propio es una asociación, ésta también debe satisfacer los requisitos previamente mencionados. Colegio de Peritos Electricistas de P.R. v. A.E.E., supra. Pero sí la asociación intenta demandar a nombre de sus miembros, contará con legitimación activa siempre que: 1) sus miembros tendrían legitimación activa para demandar; 2) los intereses que se pretenden proteger están relacionados con los objetivos de la organización; 3) la reclamación y el remedio solicitado no requieren la participación individual de los miembros en el pleito. Colegio de Peritos Electricistas de P.R. v. A.E.E., supra; P.P.D. v. Gobernador I, supra; Asociación de Maestros v. Torres, supra; Colegio de Ópticos v. Vani Visual, supra.

Siendo ésta la primera ocasión en la cual debemos expresarnos sobre la legitimación activa de unos ciudadanos que cuestionan la constitucionalidad de un estatuto penal bajo el cual nunca han sido arrestados, procesados, ni denunciados por las autoridades del orden

---

[7] De la misma manera, en Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), el Tribunal Supremo Federal estableció:

"Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally-protected interest which is (a) concrete and particularized,…; and (b) 'actual or imminent', not 'conjectural' or 'hypothetical,'… Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not …th[e] result [of] the independent action of some third party not before the court.'… Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"

público, usaremos de guía las normas seguidas en circunstancias similares en la jurisdicción federal.

El Tribunal Supremo Federal ha sido constante y claro al exigir que todo aquel que desee impugnar la constitucionalidad de una disposición penal, debe por lo menos demostrar que se encuentra bajo amenaza de acusación bajo el estatuto. Babbit, *supra*; Wolley v. Maynard, 430 U.S. 705 (1977); Ellis v. Dyson, 421 U.S. 426 (1975); Steffel v. Thompson, 415 U.S. 452 (1974). La amenaza debe ser creíble. Babbit, *supra*. Enfáticamente, dicho foro ha expresado que "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiff." Younger v. Harris, 401 U.S. 37, 42 (1971).

> To bring a cause of action in a federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is there must be some 'threatened or actual injury resulting from the putatively illegal action...' Warth v. Seldin, 422 U.S. 490, 499 (1975). Virginia v. American Booksellers Assn., 484 U.S. 383 (1988).

Los peticionarios sostienen que Babbitt v. United Farm Workers National Union, *supra*, les abre las puertas para dilucidar la constitucionalidad del Art. 103. Allí, el Tribunal Supremo Federal le reconoció legitimación activa a una unión de trabajadores agrícolas que cuestionaban la constitucionalidad de una disposición penal que criminalizaba la publicidad engañosa hacia los consumidores, aún antes de que se tratara de poner en vigor contra ellos. El Tribunal Supremo resumió los principios vigentes como sigue:

> A plaintiff who challenges a statute must demonstrate a **realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement**. O'Shea v. Littleton, 424 U.S. 488, 494 (1974). But "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." Pennsylvania v. West Virginia, 262 U.S. 553, 593 (1923); see *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974); Pierce v. Society of Sisters, 268 U.S. 510, 526 (1925).

When contesting the constitutionality of a criminal statute, "it is not necessary that [the plaintiff] first expose himself to actual arrest of prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." <u>Steffel v. Thompson</u>, 415 U.S. 452, 459 (1974); see <u>Epperson v. Arkansas</u>, 393 U.S. 97 (1968), Evers v. Dwyer, *supra*, at 204. **When plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a <u>credible threat of prosecution</u> thereunder,** he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." <u>Doe v. Bolton</u>, 410 U.S. 179, 188 (1973). But "<u>persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs.</u>" <u>Younger v. Harris</u>, 401 U.S. 37, 42 (1971); <u>Golden v. Zwickler</u>, 394 U.S. 103 (1969). When plaintiffs **"<u>do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,</u>" they do not allege a dispute susceptible to resolution by a federal court**. <u>Younger v. Harris</u>, *supra*, at 42. (Énfasis suplido.) <u>Babbitt</u>, *supra*, págs. 298, 299.

Sin embargo es preciso puntualizar que en <u>Babbitt</u>, sí existía un riesgo creíble de prosecución bajo el estatuto cuestionado: 1) siete casos se habían radicado contra el sindicato bajo otras disposiciones del mismo estatuto que contenía la disposición penal, Donald A. Dripps, <u>Bowers v. Hardwick</u> *and the Law of Standing: Noncases Make Bad Law*, 44 Emory L. J. 1417, 1430 (1995); 2) el Estado no había descartado "any intention of invoking the criminal penalty provision against unions that commit unfair labor practices", <u>Babbitt</u>, *supra*, Pág. 302; 3) por haber sido adoptado en fecha reciente, no existía un historial indicativo de que no era probable que el estatuto fuera puesto en vigor, Donald Dripps, *op. Cit.*, página 1430; y 4) estaban en juego derechos bajo la Primera Enmienda de la Constitución Federal, la libertad de expresión, que por su misma naturaleza (la exteriorización del acto frente a terceros) transciende la intimidad del hogar.

A la luz de <u>Babbitt</u> nos preguntamos: ¿se encuentran los peticionarios en este caso en idéntica o similar situación, es decir, se enfrentan ellos a una amenaza real de ser en algún momento

arrestados, procesados o acusados a tenor del estatuto que pretenden cuestionar?

Las siguientes palabras del Juez Brennan explican el significado de "threat of criminal prosecution":

> Because the decision to instigate a criminal prosecution is usually discretionary with the prosecuting authorities, even a person with a settled intention to disobey the law can never be sure that the sanctions of the law will be invoked against him. Further, whether or not the injury will occur is to some extent within the control or the complaining party himself, since he can decide to abandon his intention to disobey the law. For these reasons, the maturity of such disputes for resolution before prosecution begins is decided on a case-by-case basis, by considering the likelihood that the complainant will disobey the law, the certainty that such disobedience will take a particular form, any present injury occasioned by the threat of prosecution, and the likelihood that a prosecution will actually ensue. Blanchette v. Conneticut Cen. Ins. Corps., 419 U.S. 102, 143 n. 29 (1974).

Es oportuno mencionar que en los casos en que está en juego el derecho a la intimidad, el Tribunal Supremo Federal ha requerido también la existencia de un daño real "injury-in-fact" para conceder legitimación activa. En Poe v. Ullman, 367 U.S. 497 (1961)[8], se cuestionó si la larga historia de no prosecución de un estatuto es de por sí suficiente base para negar la revisión de una prohibición criminal que claramente aplicaba a los demandantes. Un médico y dos de sus pacientes alegaron el miedo de ser perseguidos criminalmente bajo un estatuto del estado que prohibía brindar consejo médico sobre el uso de anticonceptivos. Tal estatuto había impedido a dicho médico advertir a sus pacientes sobre las alternativas de la anticoncepción, y a su vez, cada uno de los pacientes peticionarios, enfrentarían serias

---

[8] Sin embargo Poe v. Ullman no fue siquiera mencionado en Epperson v. Arkansas, 393 U.S. 97 (1068), en el cual se determinó que una profesora tenía legitimación activa (standing) para cuestionar la validez de un estatuto que prohibía enseñar la teoría de la evolución, cuando no existía récord de ninguna prosecución bajo el estatuto. Podríamos inferir que lo que hizo la diferencia fue que en este caso estaba en juego la libertad de expresión contenida en la Primera Enmienda de la Constitución Federal.

complicaciones médicas en el caso de un embarazo. Por otra parte, el record demostraba que el Estado había aprobado el estatuto en 1879 y que fue en 1940, cuando se presentó la única acusación bajo dicha legislación para acusar a los operadores de una clínica de control de natalidad con el propósito de establecer la constitucionalidad del estatuto. Después que la Corte Suprema estatal declarara constitucional al estatuto, los cargos contra los acusados fueron declinados. En Poe, cuatro jueces del Tribunal Supremo Federal determinaron que la disputa no era justiciable:

> Appellants' complaints in these declaratory judgment proceeding do not clearly, and certainly do not in terms, allege that appellee Ullman threatens to prosecute them for use of, or for giving advice concerning, contraceptive devices. The allegations are merely that, in the course of his public duty, he intends to prosecute any offenses against Connecticut law, and that he claims that use of and advice concerning contraceptives would constitute offenses. The lack of immediacy of the threat described by these allegations might alone raise serious question of non-justiciability of appellants' claims. Poe v. Ullman, *supra*, pág. 501.

> It is clear that the mere existence of a state penal statute would constitute insufficient grounds to support a federal court's adjudication of its constitutionality in proceeding brought against the State's prosecuting officials if real threat of enforcement is wanting…The fact that Connecticut has not chosen to press the enforcement of this statute deprives these controversies of the immediacy which is an indispensable condition of constitutional adjudication. This court cannot be umpire to debates concerning harmless, empty shadows. To find necessary to pass on these statute now, in order to protect appellants from the hazards of prosecution, would be to close our eyes to reality. Id., págs. 507- 508(1971).

En Roe v. Wade, 410 U.S. 113 (1973), el Tribunal Supremo Federal denegó legitimación activa a los Doe, una pareja casada que alegaban que ellos deseaban mantenerse sin niños, y que temían que la ley de aborto del estado los previniera de obtener un aborto en el evento de que la anticoncepción fallara. El Tribunal Supremo Federal catalogó el riesgo de Jane Doe de tolerar un embarazo no deseado como

especulativo, y que el reclamo de que sufrían un daño a su felicidad marital por la existencia del estatuto, no presentaba un caso o controversia presente y actual.

Acercándonos a la situación que hoy nos atañe, la Corte de Apelaciones Federal del Onceavo Circuito hizo un pronunciamiento muy estrecho al caso de autos en Hardwick v Bowers, 760 F.2d 1202 (1985), revocado en otros aspectos en Bowers v. Hardwick, *supra*. Dos clases de demandantes instaron una acción para impugnar la constitucionalidad de un estatuto penal de Georgia que criminizaba la sodomía. Uno era un homosexual que había sido arrestado por tal conducta cometida consentidamente con otro adulto en la habitación de su hogar; en cambio los otros dos demandantes eran una pareja casada que alegaban que lo ocurrido al primero, un amigo de ellos, los disuadía de realizar la conducta prohibida por el estatuto. La Corte de Apelaciones Federal determinó en cuanto a la legitimación activa:

> The state is not currently prosecuting Hardwick or the Does under the sodomy statute. The Does have never been arrested under the statute and Hardwick cannot rely solely on his past arrest to confer upon him standing to challenge the constitutionality of the statute. (Citas omitidas.) This suit, therefore, presents an anticipatory challenge to the statute. The standing of each of the plaintiffs will depend on whether the threat of prosecution under this statute is real and immediate or "imaginary" and "speculative". (Citas omitidas.) Hardwick, págs. 1204-05.

Finalmente concluyó que el pasado arresto de Harwick, combinado con la intención del estado de hacer cumplir el estatuto y el deseo de Hardwick de seguir practicando ese tipo de conducta, le concedían legitimación activa para seguir su caso. En cambio, los Doe, que nunca habían sido arrestados ni acusados, ni enfrentaban una seria amenaza de prosecución bajo esa disposición penal, no tenían legitimación activa (standing).

Otro caso muy cercano a la situación de autos es <u>Doe v. Dulling</u>, 782 F.2d 1202 (1986)[9]. Dos adultos solteros instaron una acción para declarar inconstitucional un estatuto penal del Estado de Virginia, que prohibía la fornicación y la cohabitación entre personas no casadas entre sí. La Corte de Distrito concedió el remedio solicitado. La Corte de Apelaciones revocó bajo el fundamento de que los demandantes fallaron al demostrar por lo menos una remota posibilidad de que se encontraban amenazados de ser acusados o perseguidos por el estatuto.

> The Constitution delegates to the legislative and executive branches, not to federal courts, the establishment of broad social agendas and the expression of ideals of public morality. (Citas omitidas.) Absent threatened injury, such as prosecution, review of criminal laws is, in effect, an appropriation of power by the federal judicatury. (Citas omitidas.) Federal judges would come to operate as second vetoes, through whom laws must pass for approval before they could be enforced. Article III, however, schools federal judges in patience; we must wait specific disputes arising from the actions of those primarily responsible for social policy. Otherwise, we discard our robes for legislative hats without the electoral accountability that legitimizes the legislative product of executive enforcement." <u>Doe v. Dulling</u>, *supra*, pág. 1207.

> <u>There is no better example of the need for judicial circumspection that the instant case. In the absence of a threat of prosecution, this action represents no more that an abstract debate, albeit a volatile one</u>. Here, two plaintiffs disagree with a state statute and desire a federal court to declare it unconstitutional. Their views undoubtedly deserve consideration. The proper forum for their presentation is not, however, a federal court. The briefs before this court present instead the clash of argument in the abstract that would be better suited to a campaign for public office or legislative hearing. (Énfasis nuestro.) *Ibid*., pág. 1207.

> <u>Without a case or controversy, we are essentially invited to make a symbolic pronouncement endorsing one of many possible visions of social governance and sexual morality. This responsibility, however, has been delegated to others in our system of government.</u> Federal courts, of course, stand ready to protect individual rights whenever such rights are tangibly threatened by the operation of suspect laws. But the timing of our role is crucial; the prospect that our word may sometimes be the final one suggests it need not always be the first. (Subrayado nuestro.) *Ibid*., pág. 1209.

---

[9] <u>Doe v. Dulling</u>, *supra*, ha sido seguido en <u>Mobil Oil Corporation v. Attorney General of Commonwealth of Virginia</u>, 774 F.Supp. 1173 (1990).

En circunstancias casi idénticas a las de los peticionarios, en
Doe v. Bryan, 728 P.2d 443 (Nev.1986), el Tribunal Supremo de Nevada
determinó que cuatro adultos homosexuales, dos mujeres y dos hombres,
que nunca habían sido arrestados o procesados bajo el estatuto de
sodomía, ni se encontraban en riesgo de ser arrestados o perseguidos
bajo el estatuto, carecían de legitimación activa para solicitar por
medio de una sentencia declaratoria que se declare el estatuto
inconstitucional, aún cuando éstos sostenían que realizaron tal
conducta en el pasado e intentaban seguir practicándola en el futuro.
Incluso como en el caso de autos alegaron que oficiales estatales y
locales pondrían en ejecución el estatuto si contaban con evidencia
para ello.

Teniendo presente que la amenaza de persecución bajo el estatuto
debe ser real e inmediato y no conjetural o hipotético; City of Los
Angeles v. Lyons, 461 U.S. 95 (1983); Younger v. Harris, 401 U.S. 37,
41-42 (1971)[10]; examinemos la situación presente ante nos.

Los peticionarios alegan que tienen legitimación activa porque
practicaron la conducta prohibida por el estatuto y tienen la intención
de continuar cometiendo dicha conducta en el futuro.

> Even when the criminal statute that a litigant challenges has
> not yet been enforced against her, the challenger's claim may
> be justiciable if the challenger can demonstrate that she faces
> a threat of prosecution under the statute which is credible and

---

[10] "Appellants lack standing to enjoin criminal prosecutions under
Mississippi's breach-of-peace statutes, since they do not allege that
they have been prosecuted or threatened with them." Bailey v.
Patterson, 369 U.S. 31, 32 (1962).

"It is clear that the mere existence of a state penal statute would
constitute insufficient grounds to support a federal court's
adjudication of its constitutionality in proceedings brought against
the State's prosecuting officials if real threat of enforcement is
wanting." Poe v. Ullman, 367 U.S. 497, 507 (1961). Véase: United Public
Workers v. Mitchell, 330 U.S. 75, 91 (1947).

immediate, and not merely abstract or speculative. Navegar, Inc. v. United States, 103 F.3d 994 (1997).

Creemos que cien años de vigencia del estatuto sin que se haya puesto en vigor en su modalidad consensual entre adultos y en privado contra alguna persona, son más que suficientes para demostrarnos que el miedo de los peticionarios de ser arrestados o procesados es meramente subjetivo, hipotético e imaginario. "The mere existence of a statute, which may or not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III". Stoianoff v. Montana, 695 F.2d 1214, 1223 (9th Cir. 1983). Véase: En Navegar, Inc. v. United States, 103 F.3d 994 (1997); Diamont v. Charles, 476 U.S. 54 (1986); San Diego County Gun Rights v. Reno, 98 F3d 1121, 1126 89th Cir. 1996); Western Mining Council v. Watt, 643 f.2D 618 (1981), cert. denegado, 454 U.S. 1031 (1981). Es necesario que exista por lo menos una amenaza real de prosecución presunta presente o futura. Bickham v. Lashof, 620 F.2d 1238, 1246–47 (1980); Mack v. U.S., 66 F.3d 1025, 1033 (1995), revocado en otros aspectos en 521 U.S. 898, 138 L.Ed. 2d 914; New Hampshire to Life Political Action Comm. v. Gardner, 99 F.3d 8, 12, 17 (1996), (un miedo subjetivo no satisface el requisito de legitimación activa).

> Every criminal law, by its very existence, may have some chilling effect on personal behavior. That was the reason for its passage. A subjective chill, however, is "not an adequate substitute for a claim of specific present objective harm or a threat or specific future harm." Laird v. Tatum, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972)." Doe v. Dulling, *supra*, pag. 1206.[11]

Además, es pertinente tener en cuenta que nuestra Constitución protege la intimidad del hogar, como un principio fundamental de

---

[11] Véase: Younger, *supra*, 401 U.S. 51; San Diego County Gun Rights v. Reno, 926 F. Supp. 1415 (1995); National Rifle Association of America v. Magaw, 132 F.3d 272 (1997); Lawrence Tribe, *American Constitutional Law*, 13th Ed.,Vol. I, 2000, 3-16, pág. 409-415.

convivencia social. "No se violará el derecho al pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables." Art. II, Sec.10.

El acto punible que alegan practicar los peticionarios se realiza en la privacidad del hogar, área constitucionalmente protegida, cuyo espacio se extiende incluso más allá del hogar a la zona conocida doctrinalmente como el "curtilage". Pueblo v. Figueroa, 104 D.P.R. 721, 724 (1976); Pueblo v. Rivera Colón, 128 D.P.R. 672 (1991); Pueblo v. Meléndez Rodríguez, 136 D.P.R. 587 (1994); Pueblo v. Ortiz Rodríguez, res. el 29 de enero de 1999, 99 TSPR 9. "Así por ejemplo cuando un agente traspasa esa zona como parte de su gestión de vigilancia para observar a través de puertas y ventanas que no están claramente visibles, eso constituye un registro irrazonable." Pueblo v. Rivera Colón, *supra*, pág. 685.

La protección constitucional expuesta anteriormente dificulta enormemente, a las autoridades encargadas de la ejecución de las leyes penales, la recopilación de la evidencia necesaria para encausar a los peticionarios criminalmente.

Por todo lo cual, la alegación de los demandantes de que actualmente conviven y sostienen una relación afectiva con una persona de su mismo sexo, y que incurren en conducta que podría resultar violatoria del estatuto no demuestra la existencia de un riesgo creíble de procesamiento penal, o de daño como consecuencia de la mera existencia del estatuto. Tales alegaciones tampoco proporcionan a los peticionarios un especial interés sobre la constitucionalidad del estatuto distinto al público en general, ya que nuestra disposición penal no se circunscribe a homosexuales.

También podemos agregar que el artículo que criminaliza la sodomía no es el único estatuto penal que podría ser violatorio del derecho

a la intimidad en la vida sexual de las personas adultas, el adulterio se encuentran en idéntica situación. Y este último sí se ha puesto en vigor en nuestra jurisdicción en múltiples ocasiones.[12]

La Asociación A.C.L.U. tampoco satisface los requisitos pertinentes a la legitimación activa, ya que sus miembros carecen de ésta para demandar a nombre propio.

En cuanto a las declaraciones aisladas del Subsecretario de Justicia, Lcdo. Ángel Rotger Sabat, en una vista ante la Asamblea Legislativa, somos del criterio de que un litigante debe demostrar más que el hecho de que los oficiales estatales estén prestos a cumplir con su obligación general de hacer cumplir las leyes. En Poe v. Ullman, *supra*, se decidió que la mera alegación de que el Fiscal del Estado intentaría procesar a cualquier violador de las Leyes de Conneticut, incluyendo el uso y orientación sobre el uso de contraceptivos, era insuficiente para conferir legitimación activa para impugnar el estatuto en cuestión. Véase: Nuclear Engr's Co v. Scott, 660 F.2d 241, 251-253 (1981), certiorari denegado, 455 U.S. 993, en el cual se determinó que una declaración hecha por el Procurador General a la prensa de que intentaba perseguir criminalmente bajo el state environmental laws al demandante, no era suficiente para crear una controversia madura.

> And this is especially true where there is a complete absence of any showing of a definite and expressed intent to enforce particular clauses of a broad, comprehensive and multiprovisioned statute… The imminence and immediacy of proposed enforcement, the nature of the threats actually made, and the exceptional and irreparable injury which complainants would sustain if those threats were carried out are among the

---

[12] Los siguientes casos son apelaciones de convicciones por tal delito que han subido a este Tribunal; Pueblo v. Guzmán, 11 D.P.R. 532 (1906); Pueblo v. Birrier et al, 18 D.P.R. 265 (1912); Pueblo v. García, 24 D.P.R. 132 (1916); Pueblo v. Rivera, 26 D.P.R. 275 (1918); Pueblo v. Agustín del Valle, 34 D.P.R. 858 (1925); Pueblo v. Ocasio Rivera, 52 D.P.R. 386 (1937).

vital allegations which must be shown to exist before restraining of criminal proceeding is justified. <u>Watson v. Buck</u>, 313 U.S. 398, 399 (1941).

Creemos que la política pública de Puerto Rico se hace mucho más patente en la realidad de que, hasta donde alcanza nuestro conocimiento, en cien años de vigencia del estatuto, jamás ha sido aplicado contra persona alguna en la modalidad que los peticionarios alegan cometer. Por lo cual las palabras vertidas por el Sub-secretario de Justicia no engendran un caso o controversia justiciable como pretenden los peticionarios. Véase: <u>O'shea v. Littleton</u>, 414 U.S. 488, 493-94 (1974); <u>St. Martin's Press, Inc. v. Carey</u>, 605 F.2d 41, 44 (1979); <u>Carlin Communications, Inc. v. F.C.C.</u>, 749 F.2d 113, 123 n.20 (1984).

La demandante, Margarita Sánchez tampoco satisface los requisitos de legitimación activa. No nos persuade la alegación de la Sra. Sánchez de que se haya sentido amenazada de arresto por el incidente en la legislatura. El comentario del legislador sobre la <u>posibilidad</u> de que la peticionaria pudiera ser arrestada por sus prácticas sexuales merece por lo menos dos comentarios. Primero, las palabras fueron pronunciadas por un <u>legislador</u>, quien no es funcionario del orden público ni tiene autoridad para hacer cumplir un estatuto penal; y segundo, el comentario se refirió a la <u>posibilidad</u> de un arresto y no a la efectividad o certeza del mismo. Ello nos convence de que tal incidente no pudo generar más que un miedo subjetivo y especulativo de persecución bajo la disposición penal. Ya enfatizamos que quien desee impugnar la constitucionalidad de un estatuto penal debe demostrar la existencia de un riesgo creíble de prosecución. Por ello repetimos las palabras utilizadas en <u>Babbitt</u>: "A plaintiff who challenges a statute must demonstrate a **realistic danger of sustaining a <u>direct injury as a result</u> <u>of the statute's operation or enforcement</u>**." (Énfasis nuestro.)

Pág.298. Además, es por todos conocido que la Sra. Sánchez participa en numerosos foros, en los cuales expresa abiertamente su orientación sexual. Ello es una demostración patente de que no tiene ningún tipo de temor de ser arrestada bajo el Art. 103 del Código Penal, ni que dicho estatuto la cohíba de practicar la conducta tipificada.[13]

La sentencia declaratoria es un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los meritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra el promovente. Charana v. Pueblo, 109 D.P.R.641, 653. Por ello contrario a lo que sostiene en su escrito el Procurador General, la legitimación activa de quien pretende utilizar dicho mecanismo se rige por los mismos parámetros y normas de la doctrina de legitimación activa: la existencia de un creíble daño real no imaginario o hipotético. No es meritorio poner en marcha la maquinaria judicial en busca de un remedio cuando no existe tal daño.[14] De allí que en Moscoso v. Rivera, 76 D.P.R. 481, 492-493 (1954), expresáramos: "[l]a controversia no debe ser abstracta, teórica, remota, académica, o especulativa, esto es, debe tener suficiente actualidad, y si el daño

---

[13] Véase foto en Intrusión oficial en la intimidad, El Nuevo Día, 17 de mayo de 2002, pág.44.

[14] "El requisito de la existencia de una controversia real está conectado con la regla [59 de Procedimiento Civil, 32 L.P.R.A. Ap. III] al efecto de que la concesión de una sentencia declaratoria, considerada ésta como un remedio en equidad, descansa en el ejercicio de la sana discreción judicial. (Citas omitidas.) Se trata de una discreción judicial que debe ejercitarse dentro de ciertas fronteras, contornos o postulados jurídicos. Debe establecerse una comparación, entre determinados intereses públicos y sociales que pueden quedar afectados, y los intereses  privados de las partes, con respecto a los cuales debe medirse la magnitud y realidad práctica de la necesidad de un demandante para obtener una sentencia declaratoria, y el efecto de tal remedio sobre el demandado, al obligársele a enfrascarse en un litigio de forma anticipada. La necesidad de una sentencia declaratoria tiene sus raíces en la realidad, hasta el punto de que la controversia no sea demasiado remota y especulativa." Moscoso v. Rivera, 76 D.P.R. 481, 493-494 (1954).

que se pueda ocasionar en el futuro depende de hechos contingentes que son demasiado especulativos, no podría obtenerse una declaración judicial anticipada."(Citas omitidas.)

Asimismo, el Tribunal Supremo Federal en Steffel v. Thompson, 415 U.S. 452, 458-59 (1973), determinó que es esencial establecer una controversia justiciable bajo la ley de sentencias declaratorias, y que la validez de un estatuto criminal sería atacado solamente si el riesgo de un procesamiento criminal no era imaginario o especulativo. Véase también: Wooldall v. Reno, 47 F.3d 656 (4th Cir. 1995), certiorari denegado 515 U.S. 1141[15]; Adult Video Ass'n v. U.S. Dept. of Justice, 71 F.3d 563 (6th Cir. 1995), (el Tribunal de Apelaciones del Sexto Circuito, determinó que la sentencia declaratoria no es el remedio disponible para una asociación cuyos miembros desean distribuir filmes sexuales y temen ser procesados bajo las leyes federales de obscenidad, ya que no tenían legitimación activa, ante la ausencia de indicio de que las autoridades federales intentaran procesarlos.)

IV

---

[15] La Corte de Apelaciones del Cuarto Circuito determinó la solicitud de declaración de inconstitucional del Freedom of Access to Clinic Entrances Act, no presentaba una controversia concreta.

"Plaintiffs do not claim that they are presently to an injunction under the Access Act or that one is being sought against them. The government therefore argues that prior restraint issue has been raised prematurely and should not be decided in this case.

We agree that the time is not right for consideration of this issue. We have no factual record of an actual or threatened application of the Access Act's injunctive relief provisions. Moreover, we will not assume that a court would issue an injunction in violation of the well-established prior restraint doctrine. (Citas omitidas.) The record before us is insufficient to present the prior restraint issue in a 'clean-cut and concrete form.' (Citas omitidas.) Accordingly, we believe consideration of this issue should be deferred until a more concrete controversy arises." (Citas omitidas.) Woodall v. Reno, supra, página 658.

Ante la ausencia de un daño palpable, real, no hipotético, este recurso es inadecuado para expresarnos en cuanto a la constitucionalidad del Art. 103.

Últimamente, el concepto requerido del daño sufrido por el demandante, ha sido defendido bajo la premisa de la separación de poderes. Allen v. Right, 468 U.S. 737, 750 (1984).

Desde que el Tribunal Supremo Federal resolvió Marbury v. Madison, 1 Cranch 137, 5 U.S. 137 (1803), es el poder judicial, y no ninguna de las otras ramas, el intérprete final de la Constitución y de las leyes. De allí nació el concepto de revisión judicial tal cual lo conocemos hoy; potestad de la que este Tribunal es legítimo poseedor. Sec. 4, Art. V de la Constitución del E.L.A.; E.L.A. v. Aguayo, 80 D.P.R. 552 (1958); Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978); Silva v. Hernández Agosto, 118 D.P.R. 45 (1986). Sin embargo tan genuina e imprescindible potestad, encuentra sus límites en la doctrina de separación de poderes.

> La teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre las tres ramas. Su premisa es evitar la concentración de poder en una sola. La relación entre los poderes del Gobierno debe ser una dinámica y armoniosa. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Su perdurabilidad requiere que cuando haya un conflicto sobre el alcance de los poderes constitucionales de cualquiera de ellas, los tribunales intervengan con prudencia y deferencia para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias. Silva v. Hernández Agosto, *supra*, pág. 57 (1986).

Esta doctrina nunca pretendió establecer una completa separación de poderes entre las tres ramas, sino un sistema de frenos y contrapesos que limite la acumulación de poder en una sola rama de gobierno. Colón Cortés v. Pesquera, res. 19 de abril de 2000, 2000 TSPR 60. "[T]he Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate

to legislatures, to executives and to courts." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 559-560 (1992).

Con el fin de no entrometernos en áreas reservadas constitucionalmente a otra esfera de poder, de la tradición anglosajona hemos heredado y adoptado distintas normas de autolimitación judicial. En <u>E.L.A. v. Aguayo</u>, *supra*, pág. 596, citando a <u>Ashwander v. Tennessee</u>[16], expusimos al respecto:

> "1.—La Corte no juzgará la validez constitucional de una ley en un procedimiento amigable, no adversativo, rehusando hacerlo porque 'es legítimo decidir esas cuestiones únicamente como último recurso, y cuando es necesario en la determinación de una real, genuina y seria controversia.'
>
> "2.—La Corte 'no se anticipará a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo.'
>
> "3.—La Corte 'no formulará una regla de derechos constitucionales más amplia que la que requieran los hechos precisos a los cuales ha de aplicarse.'
>
> "4.—La Corte no juzgará una cuestión constitucional aunque haya sido sometida propiamente en los autos, si también se somete un fundamento de otra índole que permita disponer del caso.
>
> "5.—La Corte no juzgará la validez de una ley a petición de uno que no puede probar que su aplicación le causa daños.
>
> "6.—La Corte no juzgará la constitucionalidad de una ley a instancia de uno que se ha valido de sus beneficios.
>
> "7.—'Cuando se cuestiona la validez de una ley del Congreso, y aun cuando se suscite una duda seria sobre su constitucionalidad, es un principio cardinal que esta Corte primero se asegurará de que existe una interpretación razonable de la ley, que le permita soslayar la cuestión constitucional.'" (Énfasis nuestro.)

Luego el Tribunal Supremo Federal[17] añadió otra limitación, que reconocimos es <u>E.L.A. v. Aguayo</u>, *supra*, pág. 596-97, que establece que "<u>la Corte no entenderá en una cuestión constitucional si los autos no son adecuados para hacer una determinación de esa índole</u>."(Énfasis nuestro)

Estas reseñadas limitaciones, "constituyen un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que de

---

[16] 297 U.S. 288, 346 (1935).

otro modo constituiría una clara amenaza para la calidad democrática del sistema y convertiría a los jueces en guardianes de la comunidad. Factores determinantes son la falibilidad del juicio humano, la condición negativa del poder  judicial no posee la autoridad directa que adviene a las otras dos ramas por ser electas por el pueblo, y la convicción de que la Corte perdería su influencia y prestigio y finalmente su autoridad, si a diario, y fuera de los estrictos límites de un genuino procedimiento judicial, estuviese pasando juicio sobre la validez constitucional de las actuaciones legislativas y ejecutivas." E.L.A. v. Aguayo, *supra*, 597.[18]

Destacamos que veinticinco estados de los Estados Unidos de América han eliminado el delito de sodomía en su modalidad consensual entre adultos, por la vía legislativa. See Paula A. Brantner, *Removing Bricks form a Wall of Discrimination: State Constitutional Challenges to Sodomy Laws*, 19 Hastings Const. L.Q. 495,498 (1992).[19] Dieciocho estados mantienen algún tipo de prohibición estatutaria en contra de

---

[17]  Rescue Army v. Municipal Court, 331 U.S. 549, 575 (1946); International Brotherhood v. Denver Milk Producers, 334 U.S. 809 (1948); Parker v. Los Angeles, 338 U.S. 327, 329 (1949).

[18]  "En Puerto Rico, al revisitar la jurisprudencia, desde la célebre decisión de *E.L.A. v. Aguayo*, hemos advertido que el Tribunal Supremo se ha abstenido, en la mayoría de los casos, de considerar cuestiones constitucionales y ha fortalecido con sus decisiones los linderos de las tres ramas. En aquellos en los que lo ha hecho, se refleja el propósito  continuo de cumplir su mandato constitucional de revisar las actuaciones de los otras ramas de gobierno y evitar que la separación de poderes sea derrotada." José A. Andréu García, *La Revisión Judicial de Estados Unidos, Puerto Rico y Europa: Una Perspectiva de Derecho Comparado*, 34 Rev. Jur. U.I.P.R. 403, 2000, pág. 425.

[19]  Dichos Estados son: California, Colorado, Oregon, Delaware, Illinois, Connecticut, New Hampshire, New Mexico, Maine, Washington, West Virginia, Hawaii,, North Dakota, Ohio, Indiana, South Dakota, Vermont, Wyoming, Iowa, New Jersey, Nebraska, Alaska, Wisconsin, Nevada, Rhode Island.

tal conducta[20]; y solamente siete estados invalidaron dichos tipos de estatutos judicialmente: Pennsylvania (Commonweath v. Bonadio, 415 A.2d 47 (1980)); New York (People v. Onofre, 415 N.E. 2d 936 (1980)); Kentucky (Commonwealth v. Wasson, 842 S.W. 2d 487 (1992)); Tennessee (Campbell v. Sundquist, 926 S.W. 2d 250 (1996); Montana (Gryzcan v. Montana, 942 P.2d 112 (1997)); Georgia (Powell v. State, 510 S.E. 2d 18(Ga. 1998)); y Minnesota (Doe v. Ventura, 2001 WL 543734 (Minn.Co., 2001). Dentro de estos siete casos sólo en tres los demandantes se encontraban en situación parecida a los peticionarios de aquí, pues en Com v. Bonadio, supra, People v. Onofre, supra, Commonwealth v. Wasson, supra, y Powell v. State, los demandantes habían sido arrestados o convictos bajo los respectivos estatutos de sodomía.

Nuestra conceptualización de la doctrina de legitimación activa y la esbozada de la jurisdicción federal, nos llevan a rechazar los pronunciamientos estatales [21] ajenos a tal tradición, realizados, evidentemente, con la intención de explayarse sobre la

---

[20] Estos son, Arkansas (Ark. Code Ann. § 5-14-122 (1987)); Kansas, (kan. Stat. Ann. § 21-3505 (Sup. 1987)); Maryland (Md. Code. Art.27 § 553-54 (1987)); Missouri (Mo. Ann. Stat. § 566.090 (West 1999); Oklahoma (Okla. Stat. Tit. 21 § 886 (1994); Texas (Tex. Penal Code Ann. § 21.06 (1993)); Alabama (Ala. Code § 13A-6-65(a)(3)(1982)); Arizona (Ariz. Rev. Stat. § 13-1411/1412 (Sup. 1988); Florida (Fla. Sta. Ann. § 800.02 (West, 1993)); Idaho (Idaho Code §§ 18-6605 (1987)); Louisiana (La. Rev. Stat. Ann.§ 14:89 (West 1986)); Michigan (Mich. Comp. Laws Ann. §§ 750.158,750.338(b)(1979)); Massachusetts (M.G.L.A. c. 272 § 34 (1986)); Mississippi (Miss. Code Ann. § 97-29-59 (1972)); North Carolina (N.C. Gen. Stat. § 14-177 (1986)); South Carolina (S.C. Code Ann. § 16-15-120 (1985)); Utah (Utah Code Ann. § 76-5-403 (Sup. 1988)); y Virginia (Va. Code Ann. § 18-2-361 (1988). José Dávila Caballero, *El Denominado Estatuto de Sodomía en Puerto Rico*, 69 Rev. Jur. U.P.R. Pág. 1219, n.92 (2000).

[21] Si como hemos resuelto en Colegio de Electricistas de P.R. v. A.E.E, res. 22 de febrero de 2000, 2000 TSPR, que en materia de justiciabilidad, los pronunciamientos de la jurisdicción federal no son vinculantes, mucho menos estamos obligados seguir la jurisprudencia estatal.

constitucionalidad de sus respectivos estatutos.[22] Además es importante tener en cuenta que la falta de una clara amenaza de prosecución bajo el estatuto penal atacado, derrota el requisito de madurez de la controversia. Renne v. Geary, 501 U.S.312, 320-325 (1991).

> La función de los tribunales no es actuar como asesores o consejeros, sino adjudicar controversias reales que legítimamente se le presenten. Ya hemos señalado que "cuando una controversia planteada en un caso no ésta completa o lista para su adjudicación, la opinión que emita este Tribunal es de naturaleza consultiva y es deber del Tribunal, dependiendo de las circunstancias del caso, desestimar el recurso desde su [concepción] o desestimar la revisión sin considerar los méritos de los planteamientos. Noriega v. Hernández Colón, 135 D.P.R. 406, 442 (1994).

Ante la situación fáctica que presenta este caso, no es la rama judicial la llamada a determinar y pautar la política pública de este país sobre el delicado problema moral y de conciencia que se nos plantea; la constitución nos pone un freno por medio del principio de la separación de poderes. Al no existir la probabilidad de un daño real, concreto y palpable de los peticionarios no debemos expresarnos sobre la constitucionalidad de dicho estatuto.[23] Resolver de la manera que pretende la minoritaria sería abrogarnos una facultad que la

---

[22] Incluso ha sido cuestionado la legitimación activa que tenia Hardwick, en Bowers v. Hardwich, *supra*, para ser resuelto, incluso cuando éste efectivamente había sido arrestado por el delito de sodomía. Véase: Gerard Bradley, *Remarking the Constitution: A Critical Reexamination of the* Bowers v. Hardwick *Dissent*, 25 Wake Forest L. Rev. 501, 504 (1990)(nothing that "scholarly commentary has surpassed that for any case since *Roe v. Wade*"); Donald A. Dripps, Bowers v. Hardwich *and the Law of Standing: Noncases Make Bad Law*, 44 Emory L.J. 1417 (1995).

[23] "The exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is …restricted to litigants who can show 'injury-in-fact' resulting from the action which they seek to have the court adjudicate." Valley Forge Christian College v. American United for Separation of Church and State, 454 U.S. 464, 473 (1982).

Constitución no nos confiere: determinar la política pública del Estado Libre Asociado de Puerto Rico.[24]

Por los fundamentos vertidos en esta opinión, es necesario que sigamos la sabia política judicial de no adjudicar la constitucionalidad de una ley antes de que sea necesario, máxime cuando los autos son inadecuados para ello. Caquías v. Asoc. Res. Mansiones de Río Piedras, 134 D.P.R 181 (1993); Ramírez v. Romero Barceló, 112 D.P.R. 716 (1982). Si decidimos a destiempo las cuestiones constitucionales caeremos inevitablemente en pronunciamientos consultivos. Caquías v. Asoc. Res. Mansiones de Río Piedras, supra.

Las personas o grupos que se sientan afectados por la mera existencia de esta disposición penal deben tocar en otras puertas para que sean atendidos sus reclamos. Es el Poder Legislativo y no los tribunales, el llamado a atenderlos.[25]

Se dictará sentencia confirmando aquella dictada por el Tribunal de Circuito de Apelaciones.

---

[24] Por otra parte, las cuestiones relativas a la pérdida de la patria potestad o licencias profesionales, y sobre la interpretación de la Ley 54 (sobre violencia doméstica) realizadas por un tribunal que no crea precedente, han sido por primera vez alegadas en la comparecencia del Procurador General ante nos, reproducidas luego en el alegato de los peticionarios. Éstas no han sido parte ni de la demanda, ni de la oposición a la petición de certiorari ante el Tribunal de Circuito de Apelaciones, ni ante la petición de certiorari ante este Foro. Dichos argumentos por sí solos no otorgan madurez a la controversia ya que no hay proximidad temporal del daño sobre los litigantes. Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 722 (1980). Es preciso señalar que ni siquiera han alegado ser padres o estar en peligro de perder tales licencias, ni que se les haya negado protección bajo la Ley 54, por lo cual no nos han situado en posición de considerarlas.

[25] Tanto la A.C.L.U. como otras entidades están llevando este asunto ante la Legislatura. Véase: Intrusión oficial en la intimidad, El Nuevo Día, 17 de mayo de 2002, pág. 44.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Margarita Sánchez, et al

    Demandantes-Apelantes

        vs.                 AC-2000-63       Certiorari

Secretario de Justicia, et al

    Demandado

SENTENCIA

San Juan, Puerto Rico, a 28 de junio de 2002

    Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmando aquella dictada por el Tribunal de Circuito de Apelaciones.

    Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez concurre en el resultado sin opinión escrita. El Juez Asociado señor Hernández Denton disiente con opinión escrita, a la cual se une la Jueza Asociada señora Naveira de Rodón.

                          Patricia Otón Olivieri
                      Secretaria Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Margarita Sánchez, et al.

    Demandantes- Apelantes

    v.                                 AC-2000-63  Certiorari

Secretario de Justicia

    Demandados- Apelados

Opinión Disidente emitida por el Juez Asociado señor Hernández Denton a la cual se une la Juez Asociada señora Naveira de Rodón.

San Juan, Puerto Rico a 28 de junio de 2002.

La Opinión Per Curiam nos obliga a continuar disintiendo en estos casos donde el Tribunal cierra las puertas a un sector de nuestra población que invoca nuestra Constitución en busca de un remedio contra el discrimen que sufre diariamente por razón de su orientación sexual. Como muy atinadamente se señaló en la Vigésima Segunda Conferencia Judicial y en el Primer Congreso de Acceso a la Justicia en Puerto Rico, "[e]l acceso a la justicia no puede depender de los recursos económicos, **del género**, la edad, la raza, la capacidad mental o física o de

otras consideraciones respecto a las personas que necesitan un remedio judicial".[26]

A pesar de la oportunidad histórica que este recurso presenta, la Opinión Per Curiam reduce la controversia a un mero análisis sobre legitimación activa e ignora la verdadera problemática del discrimen por orientación sexual que sufren los peticionarios. De esta forma, la Mayoría recurre a una norma de abstención judicial que acomodaticiamente pospone la resolución de la controversia planteada por los peticionarios: la constitucionalidad del Artículo 103 del Código Penal de Puerto Rico, 33 L.P.R.A. 4065, que prohíbe las relaciones consensuales entre parejas adultas del mismo sexo. Aunque el Tribunal prefiera no abordar por ahora dicha controversia constitucional, antes de lo que espera tendrá que resolver este asunto que causa tanta división en nuestra comunidad.

La mayoría de este Tribunal se niega a intervenir en esta controversia mediante una interpretación restrictiva de la legitimación activa y del poder judicial. Entiende que este es un asunto que le compete a las otras ramas del gobierno, e ignora el hecho que son precisamente estas ramas las que no reconocen los derechos fundamentales de la minoría marginada que hoy acude ante nos.

Contrario a la posición mayoritaria, entendemos que el Artículo 103 que cuestionan los peticionarios causa un daño real y palpable a este sector de la población. En efecto, existe una amenaza creíble de procesar penalmente a los demandantes; suficiente, por demás, para conferirles legitimación. De hecho, el daño real y palpable que sufren los peticionarios es tan evidente que hasta el propio Estado lo

---

[26] Mensaje de Clausura del Juez Presidente señor Andréu García en ocasión de la Vigésima Segunda Conferencia Judicial de 3 de mayo de 2002. Véase, In re Conferencia Judicial de Puerto Rico, res. el 26 de abril de 2002, 2002 TSPR 55.

reconoce. Por ello, de una forma muy ejemplar el Procurador General concluye en su comparecencia que "debe reconocérsele legitimación activa a los demandantes para impugnar el Artículo 103 del Código Penal." Sin embargo, a pesar de que el Estado ha aceptado la legitimación de los peticionarios, la Opinión Per Curiam del Tribunal decide no atender su reclamo aplicando una normativa contraria tanto a  la jurisprudencia federal como a la nuestra. Por ello, disentimos.

I

En 1938, en la conocida nota al calce número 4 de United States v. Carolene Products, Co. 304 U.S. 144, 152 n. 4 (1938), el Juez Stone estimó que los tribunales deben utilizar una investigación más abarcadora, ("a more searching judicial inquiry"), en los casos en que las minorías aisladas ("discrete and insular minorities") toquen a nuestras puertas en auxilio de sus derechos constitucionales. Este escrutinio adicional es particularmente aplicable cuando las mismas invocan la Constitución para protegerse de lo que denominó Alexis de Tocqueville la "tyrannie de la majorité". Alexis de Tocqueville, Democracy in America (1835). Así pues, este Tribunal tiene, no sólo el poder, sino el deber de proteger a una minoría que sufre de unas desventajas sistemáticas en los procesos democráticos. El Poder Judicial surge como único defensor de los ciudadanos que enfrentan precisamente uno de estos quebrantos del proceso democrático.

La Opinión Per Curiam entiende que en el presente caso no existe un daño real capaz de conferir legitimación activa a los demandantes, debido a que aún no se les ha procesado penalmente y porque la amenaza de ser arrestados es especulativa. No obstante, tal curso de acción es contrario a nuestra jurisprudencia que durante las últimas décadas ha interpretado de forma flexible y liberal los requisitos de legitimación activa, particularmente al atender reclamos de ciudadanos

en defensa de sus derechos constitucionales, como en el caso de autos. Asociación de Maestros de Puerto Rico v. Secretario del Departamento de Educación, res. el 9 de mayo de 2002, 2002 TSPR 58; García Oyola v. Junta de Calidad Ambiental, 142 D.P.R. 532 (1997); Col. Opticos de P.R. v. Vani Visual, 124 D.P.R. 559 (1989); Pacheco Fraticcelli v. Cintrón Antonsanti, 122 D.P.R. 229, 237 (1988); Solís v. Municipio, 120 D.P.R. 53, 56 (1987); P.S.P. v. E.L.A., 107 D.P.R. 590 (1978); Salas Soler v. Sria. de Agricultura, 102 D.P.R. 716, 719 (1974); Cerame Vivas v. Secretaria de Salud, 99 D.P.R. 415 (1970); Asociación de Maestros v. Perez, 67 D.P.R. 849 (1947).

Este enfoque responde a que hemos reconocido que para cumplir con nuestra responsabilidad constitucional debemos interpretar liberalmente los requisitos de legitimación activa de aquellos que acuden al foro judicial. De lo contrario, cerramos las puertas de los tribunales a personas y entidades que han sido adversamente afectadas por actuaciones del Estado o de entidades particulares y que presentan reclamaciones que pueden ser debidamente atendidas por el Poder Judicial. Col. Opticos de P.R. v. Vani Visual, supra.

La Opinión Per Curiam del Tribunal intenta explicar su razonamiento al amparo de una visión excesivamente restrictiva de la doctrina federal sobre legitimación activa. No obstante, su análisis soslaya dos premisas básicas. Primero, aún bajo la normativa federal, el daño que alegan los demandantes es palpable, real y salta a la vista de incluso aquella óptica más restrictiva. Segundo, la normativa federal en estos extremos es tan sólo ilustrativa, y no limita nuestra discreción de cuán liberales podemos ser en su aplicación.[27]

---

[27] Luis M. Villaronga, Derecho Constitucional, 62 Rev. Jur. U.P.R. 683, 684 (1993). Véase además, Paul W. Khan, Interpretation and Authority in State Constitutionalism, 106 Harv. L. Rev. 1147 (1993).

De entrada debe quedar claro que a diferencia de los tribunales federales, los cuales tienen una jurisdicción limitada, nuestros tribunales son de jurisdicción general y pueden atender una gama amplia de asuntos sociales y económicos incluidos en nuestra constitución. Lo mismo ocurre en muchos tribunales estatales. Al igual que ocurre en nuestra jurisdicción, con el propósito de garantizarle a sus ciudadanos esos derechos, los tribunales supremos estatales han aplicado flexiblemente las normas de auto-limitación judicial de justiciabilidad, legitimación activa, madurez y academicidad. Véase, Helen Hershkoff, State Courts and the "passive virtues": Rethinking the Judicial Function, 114 Harv. L. Rev. 1833 (2001). De hecho, muchas de las constituciones estatales, **al igual que la nuestra**, no limitan el alcance de la intervención judicial a "casos y controversias" como lo dispone el Artículo III de la Constitución de los Estados Unidos.[28] *Véase* Robert F. Williams, State Contitutional Law, en la pág. 478 (1999); Gerald Gunther, Constitutional Law, en la pág. 1626 (Twelfth Edition 1991). Por nuestra parte, en función de los derechos positivos de nuestra Constitución y la exigencia de atenderlos afirmativamente, también nos hemos apartado juiciosamente del enfoque restrictivo federal.[29] Col. Opticos de P.R. v. Vani Visual, supra.

---

[28] El Artículo V, sección 1 de nuestra Constitución establece que "el Poder Judicial de Puerto Rico se ejercerá por un Tribunal Supremo, y por aquellos otros tribunales que se establezcan por ley". Su sección 2, dispone que "los tribunales de Puerto Rico constituirán un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración. Además, en su sección 4, establece que "[n]inguna ley se declara inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal de acuerdo con esta Constitución o con la Ley". Nótese que no existe en ninguna de dichas secciones la exigencia de caso o controversia que existe en la Constitución federal.

[29] Contrario a la visión de la Constitución federal, la nuestra propone un enfoque de derechos positivos. El Estado es responsable afirmativamente de su consecución. Véase, De Shaney v. Winnebago County, 489 U.S. 189 (1989). Ejemplo de ello es la cuidadosa atención que presta nuestra Constitución a los derechos económicos y sociales.

La Opinión que hoy emite el Tribunal es totalmente contraria a este historial.[30] Esperamos que ésta sólo represente una decisión aislada, y no el regreso a la época de antaño en que el Tribunal desempeñaba una función pasiva en nuestro ordenamiento jurídico.[31]

## II

### A

Resulta pertinente aclarar que en múltiples ocasiones el Tribunal Supremo de Estados Unidos ha atendido reclamos de litigantes no procesados por las leyes cuya constitucionalidad impugnan. Por ejemplo, en Doe v. Bolton, 410 U.S. 179 (1973), ese foro le reconoció legitimación activa a un médico que impugnó la constitucionalidad de

---

Se reconoce una amplia y diversa gama de derechos en el sector laboral. Secciones 15-18 Art. II. Se reconoce el derecho a la educación. Sección 5 Art. II. Se declara la política ineludible del Estado para la conservación de los recursos naturales. Véase, Sección 19, Art. VI; Municipio de Loiza v. Sucesiones de Marcial Suarez, res. el 11 de junio de 2001, 2001 TSPR 84. Más importante aún, la sección 19 de la Carta de Derechos exige la interpretación liberal de los derechos del ser humano, mientras señala que la lista de derechos que contiene no supone la exclusión de otros derechos pertenecientes al pueblo en una democracia. Véase, José Julián Alvarez González, La Protección de los Derechos Humanos en Puerto Rico, 57 Rev. Jur. U.P.R. 133 (1988).

[30] Es preciso indicar que no sólo las jurisdicciones estatales de Estados Unidos han liberalizado sus doctrinas de legitimación activa, sino que países de entronque civilista y de "common law" también han flexibilizado las suyas --Italia, Brasil, Holanda, Gran Bretaña, Australia, Filipinas, entre otros. Véase Matt Handley, Why Crocodiles, Elephants, and American Citizens Should Prefer Foreign Courts: A Comparative Analysis of Standing to Sue, 21 Rev. Litig. 97, 120 (2002); Carpi, Colesanti and Taruffo, Commentario Breve al Codice di Procedura Civile 149-49 (1984); Jon Owens, Comparative Law and Standing to Sue: A Petition for Redress for the Environment, 7 Envtl. Law. 321, 356 (2001).

[31] En vez de denegar la acción legitimada de los peticionarios, el Tribunal debió reconocer que el discrimen por razón de orientación sexual existe en todas las estratas de nuestro país y debió ordenar un estudio sobre sus efectos limitativos en el acceso a la justicia, tal como lo hizo en el auto-estudio histórico del discrimen por razón de género que se hizo en el 1995. Véase El Discrimen por Razón de Género en los Tribunales, Comisión Judicial Especial para investigar el Discrimen por Razón de Género en los Tribunales de Puerto Rico, agosto 1995.

un estatuto prohibitivo de ciertas prácticas abortivas.  Al disponer sobre este asunto expresó:

> Concluimos que los médicos-apelantes sí tienen legitimación, a pesar de que el expediente no refleja que ninguno de ellos haya sido amenazado o, en efecto, haya sido procesado por la violación de los estatutos estatales sobre el aborto. Los estatutos criminales operan directamente en contra de aquellos médicos que eventualmente efectúen un aborto que no cumpla con sus excepciones y condiciones. Habida cuenta de ello, los médicos-apelantes han alegado una amenaza directa y suficiente que va en detrimento de su persona. **No se les debe requerir que esperen, y pasen por dicho procesamiento, como único mecanismo para buscar remedio.** Doe v. Bolton, *supra*, pág. 188 (Énfasis suplido y traducción nuestra). *Véase además*, Planned Parenthood v. Danforth, 428 U.S. 52, 62 (1976).

De esta forma, el Tribunal Supremo federal reconoció que el grado de amenaza necesario para que un litigante ostente legitimación activa, puede surgir del hecho de que el estatuto impugnado vaya dirigido específicamente a prohibir el tipo de actividad que el demandante realice.  Igualmente, se ha señalado que no es necesario que un demandante haya sido arrestado como requisito previo para cuestionar la validez de un estatuto criminal cuando el mismo puede disuadir el ejercicio de un derecho constitucional.  Babbitt v. United Farm Workers, 442 U.S. 289, 298 (1979); Steffel v. Thompson, 415 U.S. 452, 459 (1974); Epperson v. Arkansas, 393 U.S. 97 (1968).  *Véase además*, United Food & Commercial Workers Int'l v. IPB, Inc., 857 F.2d 422 (8vo Cir. 1988).

Así también en Babbitt, *supra*, un sindicato cuestionó una ley estatal que tipificaba como delito, entre otras cosas, utilizar publicidad engañosa a fin de que los consumidores desistieran de comprar productos agrícolas.  El Tribunal Supremo rechazó el argumento de falta de justiciabilidad al resolver que "no es necesario que el demandante se exponga al arresto o al enjuiciamiento criminal para tener la potestad de impugnar un estatuto penal que viola sus derechos constitucionales". (Traducción nuestra) Babbitt, supra, en la pág.

298. Se recalcó, además, que un litigante tiene legitimación cuando manifiesta su intención de comportarse conforme a una conducta concebiblemente protegida por la Constitución; la conducta está prohibida por ley; y hay un temor real de ser procesado por ella. Babbitt, *supra*. Más importante aún, el Tribunal Supremo resaltó que como el Estado **no rechazó** que intentaría imponer el estatuto penal, existía una amenaza creíble de procesamiento.

En su alegato ante nos, el Procurador General hace un extenso y bien fundamentado análisis de esta jurisprudencia federal y también concluye que "cuando el demandante impugna el estatuto antes de haberse iniciado contra él un procedimiento criminal por violar el mismo, existe un daño "real" si el demandante demuestra que existe un "riesgo creíble" de sufrir como consecuencia de la operación o aplicación del estatuto (por ejemplo, si existiera un "credible threat of prosecution")." Sorprendentemente la Mayoría de este Tribunal no le otorga consideración alguna a que el propio Estado acepta legitimación de los peticionarios para impugnar la constitucionalidad del Artículo 103 del Código Penal, supra.

De hecho, la Opinión mayoritaria llega al extremo de intimar que aún en el caso de Bowers v. Hardwick, supra, en el cual el peticionario Hardwick **había sido arrestado por el delito de sodomía**, su "standing" es cuestionable. Véase, Opinión Per Curiam en la pág. 32, nota al calce núm. 20. ¿Qué puede entonces conferir legitimación activa a un homosexual que intenta impugnar la validez de un estatuto de sodomía? Nos cuestionamos, pues, si lo que se aplica en este caso es la doctrina de legitimación activa, o alguna otra nueva razón para justificar la auto-limitación del Poder Judicial en casos muy particulares.

B

La Opinión Per Curiam también ignora que la normativa federal que hoy invoca para evitar atender el reclamo de los peticionarios sirvió de fundamento para que varias jurisdicciones estatales de los Estados Unidos reconocieran legitimación a aquellas personas que solicitaron como remedio la invalidación de las leyes de sodomía de sus respectivos estados. Contrario a lo resuelto en el recurso de autos, estas jurisdicciones estatales asumieron su responsabilidad para con sus constituciones y calibraron el derecho a la intimidad de las personas homosexuales. [32] Mas aun, muchas de estas jurisdicciones decretaron la inconstitucionalidad de estatutos penales sobre sodomía a la luz de sus doctrinas estatales de justiciabilidad, las cuales son proporcionalmente flexibles a la vigorosidad de sus constituciones.

A modo de ejemplo, en Gryczan v. State of Montana, 942 P.2d 112 (Mont. 1997) el Tribunal Supremo de Montana, al considerar la constitucionalidad de un estatuto que criminalizaba las relaciones consensuales entre personas adultas del mismo sexo, estableció que éstas tenían un interés legítimo en su causa de acción. Según el tribunal, aunque los demandantes no habían sido arrestados ni procesados bajo el estatuto en controversia, ostentaban legitimación activa porque la mera existencia del estatuto les había causado daños: daños psicológicos a su autoestima y dignidad, el temor de

---

[32] Cabe señalar que en Europa, la Corte Europea de Derechos Humanos ha extendido el derecho a tener relaciones homosexuales privadas y consensuales a todas las naciones miembros del Consejo Europeo, con la notable excepción de Rumanía. James D. Wilets, International Human Rights Law and Sexual Orientation, 18 Hastings Int'l & Comp. L. Rev. 1, 64–65 (1994). Casi todos los otros países europeos han legalizado tales relaciones, con la excepción de Albania, y algunos de los países que formaban parte de la antigua Unión Soviética y la antigua Yugoslavia. Id. En las Américas, los únicos países que criminalizan estas relaciones son las Bahamas, Chile, Ecuador, Jamaica, Nicaragua, Trinidad y Tobago, y los Estados Unidos. Id.

ser acusados o el de perder la custodia de sus hijos, entre otros.

Así, se indicó:

> Because the legislature does not regard the statute as moribund and because enforcement has not been foresworn by the Attorney General, we agree that Respondents suffer a legitimate and realistic fear of criminal prosecution along with other psychological harms. Respondents are precisely the individuals against whom the statute is intended to operate. This is sufficient to give Respondents standing to challenge the constitutionality of the statute. Moreover, to deny Respondents standing would effectively immunize the statute from constitutional review. Gryczan v. State, 942 P.2d 112, 120 (Mont. 1997).

En Campbell v. Sundquist, 926 S.W.2d 250 (Tenn. 1996), también se le reconoció legitimación activa a los demandantes en una situación análoga a la de autos. Allí se impugnó el "Tennessee's Homosexual Practices Act" a través de una sentencia declaratoria aún cuando los demandantes no habían sido procesados bajo dicho estatuto. En el referido caso se estableció que para conceder legitimación activa a los demandantes bastaba que estos se sintieran amenazados de ser encausados por la violación del estatuto y que sintieran miedo de perder sus empleos, licencias profesionales o viviendas. *Véase además*, Bryant v. Picado, 996 S.W.2d 17 (Ark. 1999); Commonwealth v. Wasson, 842 S.W.2d 487 (Ky 1992).[33]

De igual forma, el Tribunal de Primera Instancia de Minnesota determinó que las repercusiones negativas que tenía su estatuto penal de sodomía (tales como, el miedo provocado por un posible arresto

---

[33] El Tribunal Supremo de Kentucky al declarar inconstitucional el artículo de sodomía bajo la Constitución estatal expresó que:
> [u]nder our system of dual sovereignty, it is our responsibility to interpret and apply our state constitution independently. We are not bound by decisions of the United States Supreme Court when deciding whether a state statute impermissibly infringes upon individual rights guaranteed in the State Constitution so long as state constitutional protection does not fall below the federal floor, meaning the minimum guarantee of individual rights under the United States Constitution as interpreted by the United States Supreme Court. Commonwealth v. Wasson, supra, en la pág. 492.

y procesamiento, la posible pérdida o interferencia en los derechos de visita a los niños, la posible evicción por violación a contratos de arrendamiento y los posibles efectos adversos en la adquisición de licencias profesionales de abogado, de médico o de maestro) confería legitimación activa a los demandantes. Dicho caso invalidó también su estatuto de sodomía a la luz del derecho de intimidad de la Constitución de Minnesota por conducto de una sentencia declaratoria. Doe v. Ventura, 2001 WL 543734 (Minn. Co. 2001).

En su escrito ante nos, el Procurador General acepta que "[e]sta norma de legitimación activa ha sido utilizada por tribunales federales y estatales para impugnar estatutos parecidos al Artículo 103 [del Código Penal]." Además, acepta que los peticionarios pueden ser procesados criminalmente en cualquier momento por violación del estatuto. Por ende, se allana a la impugnación que hacen los peticionarios de dicho estatuto. No obstante, nuestros compañeros Jueces entienden que todavía no hay una amenaza creíble de poder ser procesado por el Estado. Obviamente esperan que se les acuse por dichos delitos para que puedan continuar con su impugnación. De esta manera ignoran que la admisión del Estado de que los peticionarios se exponen a ser procesados criminalmente es de por sí suficiente para concederles a los peticionarios legitimación activa para impugnar el referido estatuto. Examinemos dicho daño en virtud de la amenaza creíble de procesamiento criminal que pende sobre ellos.

III

En el 1974, durante la Reforma del Código Penal, el anteproyecto original sometido ante la Asamblea Legislativa no tipificó como delito las relaciones sexuales consensuales, no-comerciales, privadas y entre adultos. En cambio, el legislador rechazó dicha recomendación y mantuvo en todo su vigor el delito de sodomía.

Véase, José Dávila Caballero, El Denominado Estatuto de Sodomía de Puerto Rico, 69 Rev. Jur. U.P.R. 1185, en la pág. 1203 (2001). Así también, en el 1986 y 1992 estuvo ante la consideración de la Legislatura la revisión de dicho estatuto. No obstante, el legislador optó una y otra vez por mantenerlo vigente. Id. Nótese, además, que la Ley Núm. 55 de 30 de mayo de 1979, la Ley Núm. 101 de 4 de junio de 1980 y la Ley Núm. 87 de 3 de junio de 1983 aumentaron la pena fijada por el estatuto.

Aún así, la Opinión del Tribunal analiza dicho artículo como si fuese más bien un vestigio inadvertido en nuestro Código Penal. No tiene razón. Evidentemente, el Artículo 103 está muy lejos de ser "moribundo", pues en la actualidad el legislador ha insistido y reiterado la tipificación de la relación íntima en cuestión.

Además, los peticionarios, una pareja de mujeres adultas que conviven y sostienen una relación sexual afectiva, dos parejas de hombres adultos en igual situación, y la organización "American Civil Liberties Union" (A.C.L.U.) en representación de algunos de sus miembros en Puerto Rico, han sido víctimas de la prohibición que ha reiterado la Legislatura una y otra vez en contra de su conducta privada.

En el caso particular de una de las demandantes, la Reverenda Margarita Sánchez, se manifiesta aun más el discrimen del que ha sido víctima. Según se desprende de los autos, ésta intentó testificar ante una comisión de la Cámara de Representantes de Puerto Rico en octubre de 1997 sobre una ley que estaba bajo estudio. Varios ciudadanos precedieron a la Reverenda Sánchez en dicha comparecencia y prestaron declaraciones sin incidentes. No obstante, cuando ésta intentó prestar declaración y expresar su opinión como ciudadana, un legislador le preguntó --para que quedara grabado en el registro

**oficial– si ella participaba en "prácticas lesbianas"; y si participaba en relaciones íntimas de índole sexual en violación del Artículo 103. Acto seguido, se le interrumpió y se le advirtió a la Reverenda Sánchez que cualquier lesbiana o persona homosexual podía ser procesada penalmente conforme al Artículo 103 debido a su orientación sexual y las relaciones privadas e íntimas que sostienen.**

**Tras estas amenazas contra la Reverenda Sánchez, el Departamento de Justicia anunció que tenía la** intención **de hacer** cumplir **el Artículo 103 y** procesar **las violaciones a esa ley. El Subsecretario de Justicia, Lic. Ángel Rotger Sabat, quien luego advino Secretario de Justicia, declaró: "La Ley [Artículo 103] existe, y en tanto exista y la policía nos presente pruebas suficientes para condenar, procesaremos [a las personas] con (sic) este delito".**

No cabe duda que estas circunstancias tomadas en conjunto confieren legitimación activa a los demandantes para impugnar dicho artículo. El Artículo 103 va dirigido específicamente a prohibir la relación íntima que los demandantes homosexuales y lesbianas realizan. Véase, Doe v. Bolton, supra. La Legislatura una y otra vez ha aumentado las penas y reiterado su parecer en que permanezca en pleno vigor el estatuto de sodomía. Los demandantes, al igual que varios miembros que representa el A.C.L.U., admiten que comparten intimidad sexual con sus parejas y entienden que la referida conducta está protegida por sus derechos constitucionales a la intimidad, la libre expresión y la igual protección de leyes.

De otra parte, el Subsecretario de Justicia expresó su voluntad y disposición de encausar criminalmente a aquellos que violen dicho artículo. En Babbitt, supra, el Estado **no negó** que impondría el estatuto penal, y eso constituyó una amenaza creíble suficiente para conferir

legitimación activa a los demandantes. El presente caso **rebasa ampliamente** el umbral de Babbitt, supra; pues, el Subsecretario de Justicia de manera **afirmativa** expuso su disposición de poner en vigor el Artículo 103. Esto definitivamente constituye una amenaza creíble del procesamiento judicial de los demandantes y confiere legitimación activa, suficiente por demás, bajo cualquier estándar liberal o restrictivo.

**¿Cuánto más palpable debe ser el daño, si el propio Estado acepta y reconoce la amenaza creíble que pende sobre los demandantes? El Procurador General, según expuso en su comparecencia ante nos, admite que lo ocurrido en las vistas en la Cámara de Representantes "constituye un ejemplo claro de daño porque ha sido a través del estatuto impugnado que se ha intentado cohibir el ejercicio de un derecho constitucional fundamental, consistente en participar mediante expresión libre en debates públicos sobre asuntos de interés general." Por eso se allanó al "meritorio argumento de los demandantes [sobre su legitimación]" y reconoció que existe un daño real por motivo de la amenaza creíble de procesamiento.**

**Sorprendentemente, la Opinión del Tribunal descartó dicha postura y optó por ignorar el daño real que sufren los peticionarios ante la posibilidad de ser procesados criminalmente. Aunque así evita que se tenga que resolver la constitucionalidad del estatuto impugnado, deja a los peticionarios sin un remedio efectivo para invocar su derecho a la intimidad, a menos que sean procesados criminalmente por los delitos proscritos por el Código Penal; dejándolos sujetos a la amenaza y al chantaje por estar expuestos a un posible procesamiento criminal bajo un estatuto cuya constitucionalidad no se les permite impugnar.**

IV

Nos parece desafortunado que la Opinión Per Curiam subestime, pues, la importancia de los derechos que se ven en juego en esta ocasión. Se ven implicados en la situación de autos los derechos a la dignidad, a la intimidad, a la libre expresión y a la libre asociación, ya que estos derechos están estrechamente relacionados con la autonomía del individuo. Al legislar sobre la conducta sexual consensual y adulta, el Estado se entromete en un área que nuestra Constitución reserva al individuo. Invade las intimidades más celosamente guardadas en nuestra sociedad. Tal intromisión en los derechos más fundamentales del ser humano no puede dejarse pasar sin el más estricto escrutinio. En casos como estos, el Tribunal tiene que ser consciente que sus doctrinas de auto-limitación tienen que ceder a consideraciones mucho más poderosas.

Cuando se ve implicado el derecho de un individuo a definirse a sí mismo libremente dentro de la sociedad, la doctrina de la legitimación activa tiene que expandirse ante los peligros del consabido "chilling effect" que pueda tener un estatuto sobre expresión posiblemente protegida. NAACP v. Button, 371 U.S. 415 (1963). Incluso la propia Opinión Per Curiam acepta que la doctrina de legitimación activa es menos restrictiva cuando se trata de un caso en el cual está en juego el derecho a la libre expresión. Véase, Opinión Per Curiam en la pág. 15, n. 8, citando Epperson v. Arkansas, 393 U.S. 97 (1968).

Sin embargo, aún así, la mayoría ignora lo ocurrido a la Reverenda Margarita Sánchez en su comparecencia al foro legislativo. Primero, un legislador le preguntó cuál era su orientación sexual, y luego, intentó silenciarla mediante un apercibimiento sobre lo que estaba expresando constituía una admisión de la comisión de un delito. De esta manera, el legislador también pretendió impugnar su testimonio enfatizando sus preferencias sexuales. No cabe duda que en este caso

el artículo 103 tuvo como consecuencia evitar que personas homosexuales expresen sus opiniones.

Lo ocurrido tiene el efecto de amedrentar y acallar la expresión de aquellas personas homosexuales sobre asuntos públicos ante la Legislatura, las cuales se encontrarán cohibidas de participar en los procesos democráticos bajo el temor de que se les indague sobre su intimidad sexual como medio de chantaje y amenaza. A nuestro juicio, esto constituye en ejemplo claro de porque los estrictos requisitos que impone la Mayoría deben ceder para evitar el "chilling effect" que tiene el Artículo 103 sobre conducta que podría estar protegida por los derechos fundamentales a la libre expresión, libre asociación, dignidad e intimidad.

Se hacen más patentes las precauciones que debemos tomar contra los peligros de ese "chilling effect", cuando recientemente el Tribunal Supremo federal en Republican Party of Minnesota v. White, 536 U.S. ___ (2002), invalidó un estatuto de Minnesota que prohibía que jueces anunciasen públicamente sus creencias sobre asuntos políticos y legales. Al igual que el caso ante nos, en dicha controversia se presentó una sentencia declaratoria y el peticionario tampoco había sido procesado. Aún así, el Tribunal Supremo Fedral reconoció la importancia que merece la libertad de expresión garantizada bajo la primera enmienda, adjudicó la controversia en sus méritos y tan siquiera cuestionó la legitimación de los peticionarios.

## V

**De otra parte, es preciso destacar como la Opinión del Tribunal obvia por completo la dimensión discriminatoria que el Artículo 103 ejerce fuera del ámbito penal. El estatuto de sodomía tiene un efecto ultra-penal que mantiene al margen de la sociedad a los demandantes. Es innegable que la criminalización de aquella expresión**

probablemente más íntima de un ser humano, su sexualidad, imprime un daño sicológico, tal como lo han reconocido varias jurisdicciones estatales, Gryzcan, supra, Campbell, supra y Powell, supra, y como lo han enfatizado los estudiosos del tema:

> Las leyes de sodomía a través de la creación de una clase criminal sirven para codificar y poner en vigor un orden social. Cubre con el estigma de criminalidad a los homosexuales y produce los siguientes efectos: (1) crea un orden jerárquico que disminuye el valor de las vidas de homosexuales y lesbianas, el cual causa un grave daño sicológico; (2) fomenta violencia física y abuso policial en contra de los homosexuales; (3) justifica la discriminación en el empleo; (4) justifica la separación de los niños de sus padres homosexuales; (5) suprime el desarrollo de las organizaciones de homosexuales; (6) acalla los derechos de expresión de los homosexuales, y (7) facilita el discrimen hacia los homosexuales inmigrantes. En resumen, los ciudadanos homosexuales son tratados y castigados como criminales, pero sin ninguna de las salvaguardas procesales que protege al acusado. (Traducción nuestra). Christopher Leslie, Creating Criminals: The Injuries Inflicted by "Unenforced" Sodomy Laws, 35 Harv. L. Rev. Civ. Rig. 103 (2000).[34]

Examinemos instancias concretas donde opera en todo su esplendor este artículo. Son las mismas que alegaron los demandantes, que reconoció el Procurador General, y que tomó en consideración el Tribunal de Primera Instancia a la hora de conferirles legitimación activa. Veamos.

La Asamblea Legislativa aprobó la Ley Núm. 8 de 19 de enero de 1995 con el propósito de añadir el artículo 166a al Código Civil. 31 L.P.R.A. 634a. Ese nuevo artículo establece las causas por las cuales se pueden privar, restringir o suspender la patria potestad y custodia. Dispone, en lo pertinente, que a una persona se le puede privar, restringir o suspender la patria potestad o la custodia sobre un hijo o una hija al "incurrir en conducta que, de procesarse por

---

[34] _Véase además_, Christopher R. Leslie, Standing in the way of Equality: How States use Standing Doctrine to insulate Sodomy Laws From Constitutional Attack, 2001 Wis. L. Rev. 29 (2001).

la vía criminal, constituiría los delitos" allí enumerados, entre los cuales se incluye la sodomía. Es decir, los homosexuales y lesbianas que sean padres o madres bajo esta reciente legislación, por el mero hecho de su orientación sexual, pueden perder la custodia o la patria potestad de sus hijos.

Nótese que la disposición legal ni tan siquiera requiere que haya una convicción bajo el Artículo 103. Tampoco que la conducta se despliegue en público, ante la presencia de los menores o que estos de otra forma resulten lesionados. En otras palabras, la legislación presume la inadecuacidad del padre o la madre para ejercer como tal por la única causa de su orientación sexual. El mero ejercicio de la conducta, independientemente de las circunstancias que la rodean, puede producir la privación de la patria potestad o la custodia.

El Artículo 103 tiene también efectos concretos en algunas de las decisiones de los tribunales, las cuales a raíz de la existencia del artículo le han negado derechos a los homosexuales y las lesbianas. Por ejemplo, el artículo sirvió de fundamento para que el Tribunal de Circuito de Apelaciones concluyera que la Ley Núm. 54 de agosto de 1989, conocida como "Ley para la Prevención y Protección contra la Violencia Doméstica", no aplicaba a parejas del mismo sexo. Véase Pueblo v. Johny Valentín Capo, Sentencia del 30 de abril de 1999, Caso Núm. KLCE199801307. El foro apelativo sostuvo:

> [m]ientras la política pública del Estado sobre relaciones homosexuales sea la establecida por el legislador en el Artículo 103 del Código Penal, estamos impedidos de resolver en forma contradictoria con dicha política. No tenemos facultad legal para reconocer derechos que no están cobijados en la Ley que se invoca y que están en contraposición con otras leyes. De ningún modo los tribunales podemos legalizar, mediante interpretación jurídica, una conducta que ha sido tipificada como delito en el Artículo antes citado. [...] El artículo tipifica las relaciones homosexuales como delito.

Otra instancia que debemos acotar en la cual no se aborda el tema del Artículo 103 propiamente, pero denota la generosidad que debe tener un tribunal a la hora de atender a aquellos que solicitan remedio en casos de discrimen, es <u>Ramos Padró v. Commonwealth of Puerto Rico</u>, (opinión no publicada), No. 133 Civ. 1770 (Dist. P.R. 1998). Recientemente una organización que agrupa policías homosexuales impugnó en la Corte Federal de Distrito de Estados Unidos para Puerto Rico la validez constitucional de un reglamento interno del Cuerpo de la Policía de Puerto Rico, que tipifica como falta grave que un miembro de la policía se "asocie con prostitutas u homosexuales o personas de dudosa reputación". El Estado Libre Asociado alegó que ninguno de los demandantes había sufrido un daño porque la disposición reglamentaria impugnada nunca se puso en vigor. Por ello, adujo que los demandantes carecían de legitimación y no existía un caso y controversia. Sin embargo, el tribunal federal resolvió sin reparo alguno que los demandantes sí tenían legitimación, a la luz de <u>Babbitt</u>, supra, y procedió a declarar inconstitucional dicho reglamento interno.

Cada vez que un homosexual o lesbiana sostiene una relación íntima, no-comercial, consensual y adulta, incurre en conducta delictiva proscrita por el Artículo 103. Dicho artículo criminaliza al homosexual y lo desvincula de la sociedad. Se le trata cómo criminal, una y otra vez, aunque todavía no haya pasado por el proceso de un juicio con las garantías constitucionales que contiene. La presencia de este estatuto da pie a que los demandantes sufran todas las circunstancias arriba mencionadas: intimidación de un legislador a una ciudadana para que no se exprese en una vista legislativa, la privación de la patria potestad o custodia de los hijos, la denegación de la protección de la Ley de Violencia Doméstica, la aplicación de

**criterios y reglamentos discriminatorios en el empleo privado y público, incluyendo entre otras la Rama Judicial.**[35]

Ninguno de estos señalamientos los calibra la Mayoría del Tribunal, lo cual hace aún más patente aquella realidad que no desea hallar. **Revela así la innegable circularidad de su análisis. Unas personas señaladas por su orientación sexual sufren las vicisitudes de ser catalogados como criminales sin que hayan pasado por un proceso criminal; sin embargo, no pueden obtener remedios ni vindicar sus derechos porque no han pasado por un proceso judicial formal. Cabe preguntar entonces, ¿qué "acceso a la justicia" es el que estamos llamados a reconocer "a las personas que necesitan un remedio judicial" si tan siquiera somos capaces de auscultar la realidad que nos presentan?**

VI

No hay duda que este es el caso propicio para que los tribunales pasen juicio sobre la validez del Artículo 103. La sentencia declaratoria es el vehículo adecuado para casos como el de autos en el que es necesario aclarar una incertidumbre jurídica sobre un propuesto curso de acción sin que el demandante tenga que incurrir (o continuar incurriendo) en éste.[36] A estos efectos, nuestro ordenamiento

---

[35] *Véase además*, Judith Berkan, <u>Mano Dura – Oficial Police Department Bias Takes A Hit</u>, 69 Rev. Jur. U.P.R. 1267 (2000); María Inés Delannoy De Jesús, <u>Sin Licencia Para Amar: Prohibición de Adopción a Personas y Parejas Homosexuales y Lesbianas en Puerto Rico</u>, 69 Rev. Jur. U.P.R. 1281 (2000).

[36] La Regla 59.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 59.1 dispone que:

> El Tribunal de Primera Instancia tendrá autoridad para declarar derechos, estados y otras relaciones jurídicas aunque se inste o pueda instarse otro remedio. No se estimará motivo suficiente para atacar un procedimiento o acción el que se solicite una resolución o sentencia declaratoria. La declaración podrá ser en su forma y efectos, afirmativa o negativa, y tendrá la eficacia y vigor de las sentencias o resoluciones definitivas. El tribunal podrá ordenar una

ha reconocido la importancia de proveer una protección cautelar contra peligros futuros a los derechos constitucionales del ciudadano. Véase, PSP v. Romero Barceló, 110 D.P.R. 248 (1980); Com. de la Mujer v. Srio. De Justicia, 109 D.P.R. 715 (1980); Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978).

**La sentencia declaratoria es un estatuto creador de nuevos remedios, con el propósito de disipar incertidumbres, y contribuir al logro de la paz social. Véase, Moscoso v. Rivera, 76 D.P.R. 481 (1954). Se trata de un remedio anterior al ejercicio efectivo de una causa de acción convencional. En Charana v. Pueblo, 109 D.P.R. 641 (1980), señalamos que la sentencia declaratoria le provee al ciudadano un mecanismo procesal de carácter remedial o profiláctico, mediante el cual puede anticiparse a dilucidar ante los tribunales los méritos de cualquier reclamación que entrañe un peligro potencial en su contra. Consiste en obtener la protección judicial antes que el peligro haya madurado hasta convertirse en una catástrofe, y antes de que la otra parte inicie un litigio para hacer efectivas sus reclamaciones. La seguridad y la certidumbre en las relaciones jurídicas es una cuestión de tanto interés público como de interés privado. Moscoso v. Rivera, supra.**

**La cuestión básica a determinar es si los hechos alegados demuestran que existe una controversia sustancial entre partes que tengan intereses legales adversos, de suficiente inmediación, madurez y realidad para que hagan aconsejable el remedio declaratorio. Moscoso v. Rivera, supra. El requisito de la existencia de una controversia real en la sentencia declaratoria --como remedio en equidad--, descansa en el ejercicio de la sana discreción**

---

vista rápida de un pleito de sentencia declaratoria, dándole preferencia en el calendario.

judicial. Esa discreción no es ilimitada, ni desencadenada. Se trata de una discreción judicial que debe ejercitarse dentro de ciertas fronteras, contornos y postulados jurídicos. Id.

Los demandantes acuden a este Tribunal a clarificar la incertidumbre jurídica real y palpable a la que se enfrentan. El Estado admite que existe una amenaza creíble que los demandantes serán encausados judicialmente, mientras continúen sosteniendo las relaciones íntimas que el Artículo 103 criminaliza. La controversia no es remota, mucho menos hipotética, cuando los demandantes interesan clarificar y dar fin a la manifiesta disposición de poner en vigor el Artículo 103 según indicara el Subsecretario de Justicia.

Por un lado, los demandantes alegan que la conducta íntima que tipifica como delito el Artículo 103 está cobijada constitucionalmente bajo el derecho a la intimidad, la libertad de expresión y la igual protección de las leyes. Por otro lado, las Ramas Legislativa y Ejecutiva han reiterado su postura de mantener en pleno vigor el Artículo 103. Sin lugar a dudas, el presente caso expone una controversia sustancial entre partes que tienen intereses legales adversos, de suficiente inmediación, madurez y realidad, según el análisis más restrictivo, a la luz de <u>Babbitt</u>, supra, y el más liberal, <u>Col. Ópticos</u>, supra.

La pluralidad de efectos directos y colaterales que provoca el referido artículo en las distintas dimensiones de la persona homosexual o lesbiana refuerza aún más el daño alegado bajo amenaza de procesamiento y expone una controversia real y actual entre las partes que amerita que ejerzamos nuestra sana discreción. La sentencia declaratoria proveería el remedio adecuado a estas

**personas que desean acceder a este Tribunal y lograr la paz social que pretende establecer este mecanismo.**

**Como bien afirma el Procurador General en su alegato, "[c]uando una persona alega que está violando un estatuto penal y tiene la intención de continuar haciéndolo, el vehículo de la sentencia declaratoria debe estar disponible para litigar la validez del estatuto, especialmente cuando, aún bajo los criterios más estrictos que establece la jurisprudencia federal y estatal, se ha reconocido legitimación activa en circunstancias parecidas al caso que hoy nos ocupa."**

Está en manos del Tribunal abrirle o no la puerta a aquellos ciudadanos que nos suplican foro para vindicar los derechos protegidos bajo el palio de nuestra Constitución. La llave perfecta para atender esta controversia es el <u>derecho de acceso a la justicia</u> sugerido en la Conferencia Judicial, el cual <u>no debe depender de los recursos económicos, del género, la edad, la raza, la capacidad mental o física o de otras consideraciones</u>. La doctrina de justiciabilidad, como mecanismo jurídico para dirimir la capacidad del Tribunal de entender en un asunto, debe ser reflejo central de ese enfoque.

Este caso nos dio la oportunidad de poner en vigor esa propuesta y permitir el <u>acceso</u> a unos demandantes para que expongan sus agravios y obtengan <u>"el remedio judicial"</u> que somos capaces de otorgar, independientemente de nuestras creencias personales sobre la conducta de los peticionarios. Hoy hemos rehusado ejercer nuestro deber de proteger a una minoría de las opresiones de la mayoría, que la margina por el sólo hecho de tener una orientación sexual distinta.[37]

---

[37] Contrario a las expresiones de la Opinión del Tribunal en su último acápite, nuestra Opinión Disidente no pretende resolver la constitucionalidad del Artículo 103 en esta etapa de los procedimientos, simplemente propone que la controversia se resuelva

Claramente, a la luz de lo resuelto en el caso de autos, el acceso a la justicia depende entonces de otras consideraciones respecto a los peticionarios, las cuales la Opinión Per Curiam no explica. No obstante, "al buen entendedor, con pocas palabras bastan." Por ende, respetuosamente disentimos.

Federico Hernández Denton<br>
Juez Asociado

---

en sus méritos en los foros inferiores por entender que el reclamo de los peticionarios es justiciable.